IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 7, 2012 Session

IN RE ANTYWON B., ET. AL.

Appeal from the Juvenile Court for Hamilton County
Nos. 240,835; 240,836; 240,837     Hon. Suzanne Bailey, Judge

No. E2011-01883-COA-R3-PT-APRIL 10, 2012

This is a termination of parental rights case in which the Tennessee Department of Children's services filed a petition to terminate the parental rights of Natasha D. and Antywon M. B. to their four oldest children. The trial court terminated Antywon M. B.'s parental rights to all four children. The court terminated Natasha D.'s parental rights to all but the oldest child, Jaiwon B. Natasha D. appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which, CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Robert B. Pyle, Chattanooga, Tennessee, for the appellant, Natasha D.

Robert E. Cooper, Jr., Attorney General and Reporter, and Lindsey O. Appiah, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Rachel M. Stephens, Hixson, Tennessee, guardian ad litem for the minors, Serenity B., Azaria B., and Antywon B.

**OPINION**

**I. BACKGROUND**

The trial court held a separate hearing for each parent on the petition to terminate their parental rights. This appeal relates to the termination of Natasha D.'s parental rights. Therefore, the factual background will mostly contain information pertaining to Natasha D. ("Mother").

Jaiwon B., Serenity B., and Azaria B. were born to Mother and Antywon M. B. ("Father") on February 5, 2004, March 1, 2005, and May 11, 2006, respectively. Less than two months after Azaria B. was born, Father took her to the emergency room, where it was discovered that she suffered from a subdural hematoma, retinal hemorrhaging, and multiple healing fractures. Upon further investigation, it was discovered that Jaiwon B. and Serenity B. also suffered from multiple healing fractures. When questioned about the injuries, Father contended that Jaiwon B. pulled a blanket off the bed where Azaria B. was resting, causing Azaria B. to fall and hit her head on the wood floor. The treating physicians declared that Father's explanation was inconsistent with Azaria B.'s injuries and that Father failed to offer any explanation for the other children's injuries. Azaria B. was subsequently diagnosed with shaken baby syndrome.

Based upon the various injuries of the three children and Father's inadequate explanation, the Tennessee Department of Children's Services ("DCS") removed the children from Mother and Father (collectively "the Parents") and placed the children in emergency foster care. The juvenile court referee found that there was probable cause to believe that the children were dependent and neglected and that removal of the children was appropriate. Four months later, the referee adjudicated the children as dependent and neglected, finding that there was clear and convincing evidence that the children were dependent and neglected because they were victims of severe abuse.

On April 8, 2007, Antywon B. was born to Mother and Father and immediately placed into foster care. The juvenile court referee found that there was probable cause to believe that Antywon B. was dependent and neglected and that removal of the child was appropriate. Two months later, the referee adjudicated Antywon B. as dependent and neglected, finding that there was clear and convincing evidence that the child was dependent and neglected "based on the fact that the [P]arents [had] been found guilty of severe abuse against the [other children and that the] circumstances had not changed."

Upon rehearing of the referee's adjudication of all four children as dependent and neglected and the finding of severe abuse, the juvenile court affirmed the referee's findings. Relative to Jaiwon B., Serenity B., and Azaria B., the court stated,

> One of the [Parents] caused the serious injuries sustained by the [c]hildren and
> the other parent should have known about the injuries and failed to protect the

[c]hildren from further abuse. Although there was testimony of other relatives keeping the [c]hildren for brief periods of time, the testimony of the parties clearly established that the [P]arents moved in together five to six weeks before the life-threatening injuries to Azaria [B.] were discovered and were the primary caretakers of the [c]hildren during that very brief period of time in which all the repeated injuries were inflicted upon these [c]hildren.

Thus, the [c]ourt finds, by clear and convincing evidence, that the [Parents] were properly adjudicated to have committed severe child abuse against all three [c]hildren and the [f]indings and [r]ecommendations of the [r]eferee should be confirmed.[1]

Relative to Antywon B., the juvenile court stated,

There is no evidence that the parents have taken responsibility for the severe abuse of the older [c]hildren. This [c]ourt finds that inflicting such serious injury upon the [c]hildren and/or failing to protect the [c]hildren from those injuries and subsequently refusing to take responsibility for inflicting the injuries or failing to cooperate with investigators to identify the individual who inflicted the injuries is "depravity." Therefore, this [c]ourt finds that [Mother] and [Father] are unfit to properly care for any child due to depravity pursuant to [Tennessee Code Annotated section 37-1-102(b)(12)(B)]. Further, this [c]ourt finds that any child in the custody of [Mother] and/or [Father] would be under such improper guardianship and control as to endanger said child's health pursuant to [Tennessee Code Annotated section 37-1-102(b)(12)(F)].[2]

DCS filed a petition to terminate Mother's parental rights to all four children on June 12, 2007. Shortly thereafter, DCS dismissed the petition. DCS then filed a second petition to terminate Mother's parental rights to all four children. At the hearing on the second petition, DCS dismissed the petition relative to Antywon B. The case proceeded on the petition relative to the three oldest children. Following the hearing, the court found that while a statutory ground existed to support the termination of Mother's parental rights, DCS had "failed to establish any legal basis for the [c]ourt to be able to find by clear and convincing evidence that it is in the best interest of the [c]hildren that the parental rights of [Mother] be terminated at this time." The court noted that a fifth child was born to Mother and Father and that DCS had not removed that child from Mother's custody but had placed

_____

[1] This order was filed on April 10, 2007.

[2] This order was filed on March 9, 2009.

that child with a relative without entering into a safety plan. The court related that the DCS case manager believed that the Parents were "capable of parenting the [c]hildren and that [the Parents did not] pose a threat to the [c]hildren." The court denied the petition to terminate Mother's parental rights on March 9, 2009.

At some point, Jaiwon B. had been removed from foster care and placed with his uncle. On July 13, 2009, Jaiwon B. was removed from the uncle's house following the uncle's decision to move and allegations that Jaiwon B. had been physically abused by the uncle. Jaiwon B. was placed in a therapeutic foster home. The court affirmed the removal and placement, directing counseling for Jaiwon and contact between him and Mother and contact between him and the other children.

Several permanency plans were entered throughout the pendency of this case. DCS filed the petition to terminate Mother's parental rights that is at issue in this case on November 12, 2010. In that petition, DCS alleged that termination of Mother's parental rights was appropriate based upon Mother's substantial noncompliance with the permanency plan, persistent conditions, and the court's previous finding of severe child abuse.

A hearing on the petition was held at which Mother and several other witnesses testified. Mother stated that she did not inflict any of the injuries on her three oldest children. She admitted that her children had been physically abused over a period of weeks and that the injuries to the children were very serious. She explained that she was a "full-time working parent" and that her "number one priority was making sure that they [were fed] and had a roof over their head." She acknowledged that she lived with the children when they were injured, that she saw them every day, and that she bathed them either two or three times a week. She related that she did not know that they had "broken bones or anything like that" and that she never noticed "loop marks" on any of the children. She recalled that Azaria B. was the only child that cried out in pain. She opined that she did not know that the children were being harmed because "it did not happen in [her] eyesight."

Relative to her relationship with Father, she testified that she was only 14 years old when she met Father and was not aware of his background. She recalled that she was only 15 years old when she had Jaiwon B. She opined that she had learned a lot about picking significant others through her experience with the case. She acknowledged that Father had pled guilty to charges relating to his abuse of the children and received a 10-year sentence for his conviction. She accepted responsibility for "not noticing that something was going on" but denied any responsibility for the children's actual injuries. She admitted that she was not "as attentive as [she] should have been." She contended that she had grown since that time and learned "a lot from this case."

Mother related that she was current with her child support and that she maintained a full-time job and insurance for all four children. She recalled that at the time the children were taken from her, she worked as a photo specialist at Walgreens and made approximately $7.25 an hour. She said that she had fulfilled the requirements to maintain a position as a certified pharmacy technician and that after becoming a certified pharmacy technician she made $11 an hour. She stated that she had created a budget plan in order to ensure that she could provide for her children in the event that they were returned. She had researched available day care programs and found a suitable program for the children to attend while she was at work. She had also acquired a vehicle that was suitable for transporting all of the children. She had completed parenting classes and attended counseling sessions. She had been visiting with the children "[b]iweekly" and had only missed one visit during the five years that they were in custody. She explained that she missed the visit because she was sick. She also attended most of the children's doctor's appointments.

Mother related that she had "jumped through so many hoops for this case" and that the only requirement that she had not fulfilled was to maintain housing for herself and the children. She admitted that housing was an important requirement and that the children could not be returned to her immediately because she did not have a place for them to stay. She said that she lived in a three-bedroom house with her sister, her sister's husband, and three children. She acknowledged that she was "no closer to getting [a residence for the children] today than [she was] two years ago." She said that she had applied for public housing but that it would likely take a month for her to be approved. She admitted that she probably could not care for all four children right away because "[i]t would take some work just to get used to it, because [she hadn't] been" taking care of them. She suggested that she could likely care for two at first and then care for all four once she was ready. She insisted that termination of her parental rights was not appropriate because she had grown and because the children had grown and would be able to tell "if something was to happen to them, versus when they [were] two and one and two months old" and "couldn't talk."

Judi Phillips, a licensed professional counselor for Coping Concepts Clinical Services, testified that she had led counseling sessions with Mother, Serenity B., Azaria B., and Antywon B. She related that she began working with Serenity B. and Antywon B. in June 2010 and that she began working with Azaria B. in March 2011. She recalled that she worked with the children approximately twice a month and that she had extended an invitation to Mother to attend the sessions once a month. She said that Mother, when able, attended the sessions. She opined that when Mother attended the sessions, the children viewed their time with Mother as a "play date" and that at times, the children appeared to be "guarded" when interacting with Mother. She stated that while Mother had been able to redirect their behaviors when appropriate, she had not observed any "deeper connections" between Mother and the children. She explained that Mother's limited relationship with the

children concerned her "[b]ecause of the level of need of each of the[] children individually, all three of them collectively, because of the fact that they have not had that connectedness with [Mother]." She believed that "[i]n order for [the children] to have that connectedness, it would be necessary for [Mother] to be consistently, daily, in their lives, not for snippets of time."

Ms. Phillips also believed that immediately returning the children to Mother would take a great deal of time and could be "damaging" to the children because of their emotional needs. She contended,

> As far as permanency for these children, I most definitely believe that they need to be in a stable consistent home, that they have such a level of need, that they are going to need caregivers who are able to be present to them daily for hours at a time without the possibility of being moved to childcare or something like that, because of the level of the need that they have.

She said that the children had such a high level of need

> because of what [] happened to them, not only from a physical perspective, but from an emotional perspective, and the fact that their case has remained without permanency for such a long period of time, they're so young. And the fact that when they are removed from a parent and then they're moved into foster care, that itself is a trauma. But these children have been moved more than once, and that's a significant concern.

She admitted that the children referred to Mother as "Momma Natasha" but explained that while they had an "awareness" of her role, the children did not have an emotional bond with Mother "at the present time." She opined that it would "take a significant period of time for "that to happen for each child individually." She said that the children likely had "attachment issues" and would have problems attaching to anyone in their life. She admitted that Mother's lack of visitation was not Mother's fault because Mother was consistent with her court-allowed visitation time.

Jucinta Rome, a licensed clinical social worker for Coping Concepts Clinical Services, testified that she had been meeting with Jaiwon B. since April 2009. She recalled that Mother had attended four sessions in 2009 and three sessions in 2011. She related that DCS had asked Mother not to participate in the sessions with Jaiwon B. but that Mother resumed her participation in 2011. She stated that Jaiwon B. had

struggled, ever since [she had] been working with him, with behavioral challenges, such as attention and concentration difficulties, anger and aggression, difficulty interacting appropriately, socially in the classroom environment which led him into coming out of the Hamilton County school system, regular school program, and being placed at the Dawn [S]chool which is a school definitely for emotional and behavioral distraught children. He began that school in December [] 2010.

She contended that Jaiwon B. also struggled with trust, "managing his anger," and had "difficulty with lying and stealing." In her interactions with Mother and Jaiwon B., she observed "a foundation for attachment" in that he responded and listened to Mother. She recalled that he was sad when Mother left the sessions. She believed that Mother needed "an opportunity to parent Jaiwon [B.] because there [was] a foundation of some attachment." She opined that Mother could not care for Jaiwon B. and the other children at the same time because of Jaiwon B.'s level of need. She believed that adding three additional children to the relationship would not be in the best interest of the children or Mother.

Father testified that he moved in with Mother toward the end of June 2006. He said that prior to that time, he could not take care of the children because his hand had been injured. When he moved in with Mother, he was still suffering from a bullet wound to his left hand. He related that he lived with Mother for approximately a week and a half before the children were removed. He admitted that he had pled guilty to attempted aggravated child abuse involving Jaiwon B., Serenity B., and Azaria B.

Debra Kennedy testified that she had been the DCS case manager for the children since September 2009. She believed termination of Mother's parental rights was appropriate because Mother could not parent all four children at the same time. The children could not be placed with Mother because each child required a different level of care. Jaiwon B. could not be placed with the other children due to his behavior issues, while the other three children also had their own behavior issues. She contended that Jaiwon B.'s current foster parent was considering adoption and that the other three children had been placed in the same foster home that was willing to adopt all of them. She admitted that previous foster parents had expressed a desire to adopt Serenity B., Azaria B., and Antywon B. but that those foster parents had changed their minds due to the children's behavior issues. She stated that adoption was in the best interest of each child because they each needed permanency and had been in DCS custody for too long.

Ms. Kennedy testified that Mother had failed to acquire adequate housing for the children. She had urged Mother to obtain housing in order to facilitate visitation with the children, but Mother never made any progress. She admitted that she did not write a letter

to the housing authority on Mother's behalf. She also admitted that she had not obtained Mother's individual counseling reports even though the office that obtained the records was close to her office. She believed that Mother was not any closer to obtaining custody than when she was in 2009 and that a safety concern remained relative to Mother's ability to protect all four children. She recalled that Mother had never disclosed the incident that brought the children into custody and had never accepted responsibility for what happened to the children.

George Bercaw, the clinical director for Tennessee Community Counseling Center, testified that he evaluated Mother and found that she exhibited symptoms of an "adjustment disorder" and that he initially thought that "she might have been a passive dependent individual." He ruled out that diagnosis after "further assessment and treatment." He opined that Mother was a "rather normal person" and "was not at [that] time . . . exhibiting any indications of a significant psychological disorder." He related that apart from the fact that Mother needed guidance and was not "sufficiently attentive at home," he had no reservations about her raising the children. He recalled that he spoke with Mother about her poor judgment with men. He believed that Mother made a lot progress in therapy and was able to pay attention to her emotions, was less passive, was more assertive, and was more invested in herself. While he did the "initial workup" with Mother, his intern conducted the therapy.

Mr. Bercaw testified that Mother was "very upset" when she discovered the abuse of the children. He related that Mother terminated her relationship with Father in August 2010 and "was doing everything that the state was telling her that she had to do to get custody back." He opined that it was not uncommon for Mother to continue her relationship with Father long enough to have another child with him. He believed that Mother was manipulated by Father and was very young and immature.

Following the hearing, the court held that a statutory ground existed to support the termination of Mother's parental rights in that she had been found to have committed severe child abuse. The court further held that termination of Mother's parental rights was in the best interest of Serenity B., Azaria B., and Antywon B. The court opined that Mother failed to make the necessary changes allowing the children to be placed in her care; that she refused to accept her role in the severe abuse, failed to keep the children safe, and had been found to have severely abused the children; that she failed to obtain and maintain a home where the children could visit; that a change of caretakers would negatively affect the children; and that continuation of her relationship with the children would greatly diminish their chances "of early integration into a stable and permanent home." Relative to Jaiwon B., the court found that termination of Mother's parental rights was not in his best interest because he was the only child who had likely bonded with Mother. The court stated,

Due to [Jaiwon B.'s] behavioral issues, [he] ha[d] been separated from his siblings for most of this case and due to his prior bond with [Mother] may be able to benefit from [Mother's] care and attention since he cannot be placed with other children due to his aggressive behaviors.

Accordingly, the court terminated Mother's parental rights to Serenity B., Azaria B., and Antywon B. but refused to terminate Mother's parental rights to Jaiwon B. Mother timely appealed the court's termination of her parental rights relative to Serenity B., Azaria B., and Antywon B. DCS did not appeal the court's refusal to terminate Mother's parental rights to Jaiwon B.

## II. ISSUE

We consolidate and restate the issues raised on appeal by Mother as follows:

Whether termination of Mother's parental rights was in the best interest of the children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest
[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be

correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

Mother concedes that a statutory ground for termination existed based upon the court's prior finding that she committed severe abuse "against the child[ren] who [were] the subject of the petition [and] against [the] sibling . . . of such child[ren]." Tenn. Code Ann. § 36-1-113(g)(4). The Tennessee Code defines "severe child abuse," in pertinent part, as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> > (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
>
> (B) Specific brutality, abuse or neglect toward[] a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
>
> (C) The commission of any act toward[] the child prohibited by §§ 39-13-502-- 39-13-504, 39-13-522, 39-15-302, 39-15-402, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act toward[] the child[.]

Tenn. Code Ann. § 37-1-102(b)(23). We agree that a statutory ground for termination of Mother's parental rights existed and that clear and convincing evidence supported termination based upon that ground.

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the children. In making this

determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against Mother. Despite her participation in the creation of several permanency plans, Mother refused to make the changes necessary to adequately care for the children. Tenn. Code Ann. § 36-1-113(i)(1). Mother failed to obtain adequate housing for the children, despite the fact that she had several years to secure housing and was told that procurement of housing could lead to additional visitation. Mother failed to make a lasting adjustment of her circumstances, despite being given adequate time to accept responsibility for her actions and improve her circumstances. Tenn. Code Ann. § 36-1-113(i)(2). The children had been in foster care for approximately four years prior to the filing of the petition that is at issue in this case; however, Mother testified that she was not ready to care for all of the children at the same time and did not have adequate housing. While a meaningful relationship had arguably been established between Mother and Jaiwon B., the other three children had not bonded with Mother and were "guarded" during visitation with her. Tenn. Code Ann. § 36-1-113(i)(4). We acknowledge that Mother was only provided with bi-weekly supervised visitation with the children and that bi-weekly visitation was likely insufficient to facilitate an adequate bond between Mother and the children. As previously discussed, four years had elapsed prior to the filing of the instant petition. We believe four years was an adequate amount of time for Mother to put herself in a position to secure additional unsupervised visitation, allowing her to enjoy a meaningful bond with the children.

Additionally, the children presently reside in a safe and stable foster home and have bonded with the foster parents, who are willing to adopt them. Removing the children from the foster parents and returning them to Mother when she would be finally able to care for them would likely traumatize the children. Tenn. Code Ann. § 36-1-113(i)(5). Father severely abused the three oldest children. Tenn. Code Ann. § 36-1-113(i)(6). Questions remain as to whether the physical environment of Mother's potential home would be safe. Tenn. Code Ann. § 36-1-113(i)(7). Mother's questionable judgment in continuing her relationship with Father for years after the children were severely abused casts doubt upon her ability to protect the children from future harm. Additionally, the injuries to the children

were severe and occurred over a number of weeks. We find it hard to believe that Mother did not notice these injuries.

We acknowledge that Mother took advantage of the opportunities for supervised visitation with the children, that her mental and emotional status does not appear to be detrimental to the children, and that she was current with her child support. Tenn. Code Ann. § 36-1-113(i)(3), (8), (9). However, we believe the above considerations overcome Mother's positive mental emotional status and her compliance with visitation and child support. Mother was given more than an adequate amount of time to provide a home for her children and put herself in a position to adequately care for all of her children at the same time. We find it especially troubling that Mother continued her relationship with Father for several years after the children were removed and even had another child with Father, who was arguably solely responsible for the severe injuries to the three oldest children. Mother only ended the relationship after two petitions for termination of her parental rights had already been filed. Mother questions the court's termination of her parental rights in light of the fact that Serenity B., Azaria B., and Antywon B. will no longer enjoy visitation with Jaiwon B. and the youngest child. While we do not wish to discount the potential bond that had developed between the siblings, the children had been separated for quite some time prior to the filing of the petition to terminate Mother's parental rights. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the children. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Natasha D.

_____
JOHN W. McCLARTY, JUDGE

-14-